Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silver-Korn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JENNIFER ANDREWS and JOHN SARLEY, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> GOOGLE LLC, a Delaware limited liability company, <br><br> *Defendant.* | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiffs Jennifer Andrews and John Sarley, individually and on behalf of a proposed class, bring this Class Action Complaint against Google LLC seeking restitution, damages, an injunction, and other appropriate relief from Google's ongoing participation in an illegal internet gambling enterprise. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## <u>INTRODUCTION</u>

1. Over the last decade, the world's leading slot machine makers—companies like International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have teamed up with American technology companies to develop a new product line: social casinos.

2. Social casinos are apps, playable from smartphones, tablets, and internet

browsers, that make the "authentic Vegas-style"[1] experience of slot machine gambling available to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino Gameplay). By moving their casino games directly onto the phones and computers of players, and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino companies, along with Google, Facebook, and Apple (the "Platforms"), have found a way to smuggle slot machines into the homes of consumers nationwide, twenty-four hours a day and three-hundred-sixty-five days a year.

3.       Just like Las Vegas slot machines, social casinos allow users to purchase virtual "chips" in exchange for real money, and then to gamble those chips at slot machine games in hopes of winning still more chips to keep gambling. In DoubleDown Casino, for example, players purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular" Chip Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow players to cash out their chips. Instead, purchased chips and won chips alike can be used only for more slot machine "spinning."

**Figure 1**                    **Figure 2**

---

[1]       DoubleDown Interactive Co., Ltd., Form F-1/A at 87 (June 30, 2020), https://bit.ly/2QqLW6v.

[2]       This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

4.      Nevertheless, like Las Vegas slots, social casinos are extraordinarily profitable and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional slot machines with the power of the Platforms, including Defendant Google, to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[3]

5.      Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only do the Platforms retain full control over allowing social casinos into their stores, and their distribution and promotion therein, but they also share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves.

6.      Because the Platforms are the centers for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

7.      Last year alone, consumers purchased and gambled away an estimated *$6 billion* in social casino virtual chips.[4]

8.      By utilizing Google for distribution and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Google (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Google's 30 percent rake, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

9.      The result (and intent) of this dangerous partnership is that consumers become

---

[3]    *See, e.g.*, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWS HOUR (Aug. 13, 2019), https://bit.ly/3tSHqMI.

[4]    *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans Sheltered at Home*, CASINO.ORG, https://bit.ly/3fbn793.

addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

10.     These devastating consequences are not hypothetical or hyperbole: below are excerpts of sworn testimony from individuals describing their experiences with three different social casinos at issue in this case:

- **DoubleDown Casino:** "I was drawn to DoubleDown because I could play the same games that I played when I went to real casinos. . . . Overall, I estimate that I have spent over $40,000 on chips in DoubleDown Casino. I am addicted to DoubleDown Casino. . . . I knew being on DoubleDown Casino every day for hours was a problem, but I couldn't seem to stop. I believe that DoubleDown is taking advantage of people's addictions. *They know that gambling is addictive, and they act exactly like a physical casino that pays out money.* I feel alone and embarrassed about spending money to do something that only feeds my addiction. DoubleDown Casino consumes you, and makes you feel like you always have to go play. I feel guilty because I've spent money on DoubleDown that I've needed to pay bills or buy food." Exhibit 1, Declaration of Willa Moore [emphasis added].

- **DoubleDown Casino:** "I believe I have spent close to $25,000 on DoubleDown Casino. I would buy the chips with a credit card which I couldn't pay in-full, so there's interest on top of that too. . . . I was a well-respected, active member of my community who owned my own business for 36 years. But when I retired, and my fellow started having health problems, DoubleDown Casino made me fall into the trap of escape and adrenaline rush to cope with all my other responsibilities. When I won, it was just great. When I lost, and started buying more and more chips, I felt lower than pond scum. I was sick to my stomach, felt like a total loser, *wondered about suicide* (although I would never leave my partner), could not sleep, had anxiety attacks with a rushing heart, and couldn't eat. I just couldn't understand how I could let it get so out of control. *It was as if it had a power over me that I couldn't break. I couldn't stop.*" Exhibit 2, Declaration of Jan Saari [emphasis added].

- **Jackpot Party Casino:** "Overall, I believe that I have spent between $10,000-$20,000 playing Jackpot Party Casino. I was addicted to Jackpot Party Casino and I hate that. . . . *This kind of loss put a huge strain on my ability to even buy food* . . . I believe Jackpot Party Casino had been taking advantage of my addiction. . . . This game hurt me and the worst part was that when my husband was alive, he would say, 'You're not spending money on there are you?' and I lied. I hate that I have to live with that now." Exhibit 3, Declaration of Laura Perkinson [emphasis added].

- **Jackpot Party Casino:** "I believe that I've spent at least $30,000 on Jackpot Party Casino . . . . *I am going through a divorce right now, in part because of how much money I spent on Jackpot Party.* . . . Scientific Games will provide incentives to their top spenders so that they continue to spend. I have received Christmas gifts two times. They have sent me a robe, oils, phone charger, bath bombs, a blanket, and more. I know that

they have sent other players flowers and candies . . . This game has changed my way of thinking and caring. I never thought I would get addicted to anything except cigarettes, but this has taken too much of my life away. I don't know how my life would be different without this game, but I know that it would be better and I know that I would be much better off financially. . . . I wish it didn't exist." Exhibit 4, Declaration of Donna Reed [emphasis added].

- **High 5 Casino:** "I have spent at least $10,000 on coins in High 5 Casino . . . I believe I am addicted to High 5 Casino. . . . I have tried to quit but I believe three weeks is the longest amount of time I've ever been able to stop. . . . Sometimes I feel guilty about playing High 5 Casino and spending so much money. My husband does not know I have spent money on it. *My grandkids will sometimes ask for money and I can't give it to them because I have to save it for this game*." Exhibit 5, Declaration of Aida Glover [emphasis added].

12. Unsurprisingly, social casinos are illegal under many states' gambling laws.

13. As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14. As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Google, host it and collect their 30% rake). This year, consumers will purchase approximately $300 million worth of virtual casino chips in DoubleDown Casino. That $300 million will be divided up approximately as follows: $170 million to DoubleDown; $30 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game intellectual property to DoubleDown); and—as particularly relevant here—the remaining $100 million to Google and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15. In other words, despite knowing that DoubleDown Casino is illegal, Google and the other Platforms continue to maintain a sizable (30%) financial interest by hosting the game,

1   driving customers to it, and acting as the bank.

2       16.     As such, DoubleDown, Google, and the other Platforms are all liable as co-

3   conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of

4   more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host and profit

5   from.

6       17.     Consequently, Google and the other Platforms—alongside the Illegal Slot

7   companies—are liable as co-conspirators to an illegal gambling conspiracy.

8       18.     Defendant Google, for its part, is a direct participant in an informal association

9   and enterprise of individuals and entities with the explicit purpose of knowingly devising and

10  operating an online gambling scheme to exploit consumers and reap billions in profits (the

11  "Social Casino Enterprise").

12      19.     This ongoing Enterprise necessarily promotes the success of each of its members:

13  Social casino operators, like DoubleDown, need Platforms like Google, Apple, and Facebook, to

14  access consumers, host their games, and process payments. The Platforms, for their part, need

15  developers like DoubleDown to publish profit-driven and addictive applications on their

16  platforms to generate massive revenue streams.

17      20.     Through this case, Plaintiffs seek to force Google to stop participating in, and to

18  return to consumers the money it has illegally profited from, the Social Casino Enterprise.

19      21.     Plaintiffs, on behalf of the putative Class, bring claims for damages and for

20  injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §

21  1961, *et seq.* ("RICO"), and California's Unfair Competition Law, Business and Professions

22  Code § 17200, *et seq.* ("UCL").

23                              **PARTIES**

24      22.     Plaintiff Jennifer Andrews is a natural person and a citizen of the State of

25  Minnesota.

26      23.     Plaintiff John Sarley is a natural person and a citizen of the State of California.

27      24.     Defendant Google LLC is a corporation existing under the laws of the State of

28  Delaware, with its principal place of business located at 1600 Amphitheatre Parkway, Mountain

View, California 94043. Google develops, markets and distributes the Google Android Operating System (OS), an open-source operating system for mobile devices. Google owns and operates the Google Play Store, which comes preinstalled on every Android device.

## JURISDICTION AND VENUE

25.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

26.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant's alleged wrongful conduct occurred in and emanated from this District.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## GENERAL ALLEGATIONS

**I.      Social Casinos Are Illegal Slot Machines Under California Law.**

28.     Slot machines have long been outlawed in California.

29.     California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

30.     In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

31.     Consequently, social casinos, as described herein, are illegal slot machines under California law.

32.     California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot

machines. After two years of subsequent litigation, the parties in *Kater* reached a $155 million nationwide class action settlement. The settlement was finally approved in February 2021.[5]

33.     California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

34.     Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

35.     Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of DoubleDown Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[6]

36.     In other words, social casinos are not just illegal under California law, but they would not be legal slot machines under *any state law* as they cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate slot machine.

## II.     Google Hosts and Facilitates At Least Fifty Illegal Social Casinos.

37.     The Platforms, including Defendant Google, have directly assisted in creating the unregulated market of virtual casino games from the outset of the industry.

38.     Before gaining access to these social media platforms, the Illegal Slots used

---

[5]     Settlements in two related cases were also finally approved in February 2021. Three more related cases are being litigated in Washington, against the owners and operators of certain social casino games. *See Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1316 (W.D. Wash. Nov. 13, 2018) (settled); *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1041 (W.D. Wash. Nov. 20, 2018) (settled); *Fife v. Sci. Games Corp.*, No. 2:18-cv-00565, 2018 WL 6620485, at *4 (W.D. Wash. Dec. 18, 2018) (in litigation); *Wilson v. PTT, LLC*, 351 F. Supp. 3d 1325, 1337 (W.D. Wash. Dec. 14, 2018) (same); and *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117 (9th Cir. 2020) (same).

[6]     *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE (Jan. 12, 2012), https://bit.ly/3sk0nYf [emphasis added].

methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

39.     The core marketing for the Illegal Slots is accomplished in concert with the Platforms, and their systems are inextricably linked. DoubleDown described this very setup in a public filing:

> Our games are distributed through several main platform providers, including Apple, Facebook, Google, and Amazon, which also provide us valuable information and data, such as the rankings of our games. Substantially all of our revenue is generated by players using those platforms. Consequently, our expansion and prospects depend on our continued relationships with these providers.
> ….
>
> We focus our marketing efforts on acquiring new players and retaining existing players. We acquire players both organically and through paid channels. Our paid marketing includes performance marketing and dynamic media buying on Facebook, Google, and other channels such as mobile ad networks. Underlying our paid marketing efforts are our data analytics that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period. Our broad capabilities in promotions allow us to tailor promotional activity around new releases, execute differentiated multi-channel campaigns, and reach players with preferred creative content.
> ….
>
> Our player retention marketing includes advertising on Facebook as well as outreach through email, push notifications, and social media posts on channels such as Facebook, Instagram, and Pinterest. Our data and analytics also inform our retention marketing efforts. Campaigns are specially designed for each channel based upon player preferences for dimensions such as time of day and creative content. We consistently monitor marketing results and return on investment, replacing ineffective marketing tactics to optimize and improve channel performance.
> ….
>
> We employ a rigorous, data-driven approach to player lifecycle management from user acquisition to ongoing engagement and monetization. We use internally-developed analytic tools to segment and target players and to optimize user acquisition spend across multiple channels.
> ….
>
> We continuously gather and analyze detailed customer play behavior and assess this data in relation to our judgments used for revenue recognition.[7]

---

[7]     DoubleDown Interactive Co., Ltd., Form F-1/A at 16, 72, 85, 91 (June 30, 2020), https://bit.ly/2QqLW6v.

40.     By moving to online platforms for marketing, distribution, and payment processing, Defendant Google entered into a mutually beneficial business partnership with the Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting money from consumers, Google and the other Platforms take a 30 percent commission off of every in-app purchase, earning them billions in revenue.

41.     Prior to being published in the Google Play Store, developers must submit their app for review. In this process, Google examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available. Apps may be, and often are, removed at Google's discretion for violating its policies and can be audited at any time.

42.     Google closely monitors its gambling liability by responding to the changing market landscape when it deems necessary. For example, in response to the FTC's increasing consumer protection concerns around gambling in 2018, Google changed its policies for loot boxes, requiring games with that feature to "disclose the odds of receiving those items in advance of purchase."[8] Google likewise heavily regulates advertising in its system that involves gambling, stating "[w]e support responsible gambling advertising and *abide by local gambling laws* and industry standards."[9]

43.     As such, Google, and the Platforms, through their app review process, are keenly aware of the illegal and deceptive nature of the Illegal Slots. Google knew of the unlawful nature of the Illegal Slots and nonetheless knowingly hosted the unlawful gambling apps and promoted their success.

44.     Furthermore, on information and belief, in the wake of the *Kater* decision, the Platforms did not remove any social casinos from their offerings and conferred with each other at that time, jointly deciding that they would each continue to offer illegal social casino games.

---

[8]     Mariella Moon, *Google Will Force Android Apps to Show the Odds of Getting Loot Box Items*, ENGADGET (May 30, 2019), https://engt.co/31hmCCk.

[9]     Gambling and Games, Google Advertising Policies, https://bit.ly/3d3nsI7 [emphasis added].

## A.    The Illegal Slots

45.    Each of the following fifty social casinos offered by Google (together the "Illegal Slots") is an illegal slot machine under California law.[10]

### Figure 4 – The Illegal Slots

| # | Game Title | Google Play URL |
|---|---|---|
| 1 | Slotomania Free Slots: Casino Slot Machine Games | https://play.google.com/store/apps/details?id=air.com.playtika.slotomania |
| 2 | Jackpot Party Casino Games: Spin Free Casino Slots | https://play.google.com/store/apps/details?id=com.williamsinteractive.jackpotparty |
| 3 | Cash Frenzy Casino - Free Slots Games | https://play.google.com/store/apps/details?id=slots.pcg.casino.games.free.android |
| 4 | Cashman Casino: Casino Slots Machines! 2M Free! | https://play.google.com/store/apps/details?id=com.productmadness.cashmancasino |
| 5 | Huuuge Casino Slots - Best Slot Machines | https://play.google.com/store/apps/details?id=com.huuuge.casino.slots |
| 6 | Vegas Slots - DoubleDown Casino | https://play.google.com/store/apps/details?id=com.ddi |
| 7 | POP! Slots - Play Vegas Casino Slot Machines! | https://play.google.com/store/apps/details?id=com.playstudios.popslots |
| 8 | House of Fun: Free Slots & Casino Slots Machines | https://play.google.com/store/apps/details?id=com.pacificinteractive.HouseOfFun |
| 9 | Lotsa Slots - Free Vegas Casino Slot Machines | https://play.google.com/store/apps/details?id=com.diamondlife.slots.vegas.free |
| 10 | DoubleU Casino - Free Slots | https://play.google.com/store/apps/details?id=com.doubleugames.DoubleUCasino |
| 11 | Slots: Heart of Vegas- Free Casino Slots Games | https://play.google.com/store/apps/details?id=com.productmadness.hovmobile |
| 12 | Lightning Link Casino: Best Vegas Casino Slots! | https://play.google.com/store/apps/details?id=com.productmadness.lightninglink |
| 13 | Caesars Casino: Casino & Slots For Free | https://play.google.com/store/apps/details?id=com.playtika.caesarscasino |
| 14 | Quick Hit Casino Games - Free Casino Slots Games | https://play.google.com/store/apps/details?id=com.ballytechnologies.quickhitslots |

---

[10]    For the Court's convenience, a Samsung Galaxy Tablet containing Google-based versions of the Illegal Slots will be lodged with the Court as Exhibit 6. Upon request from Google's appearing counsel, a copy of the Tablet will be produced to Google.

| 15 | Hit it Rich! Lucky Vegas Casino Slot Machine Game | https://play.google.com/store/apps/details?id=com.zynga.hititrich |
| 16 | Billionaire Casino Slots - The Best Slot Machines | https://play.google.com/store/apps/details?id=com.huuuge.casino.texas |
| 17 | Wizard of Oz Free Slots Casino | https://play.google.com/store/apps/details?id=com.zynga.wizardofoz |
| 18 | Gold Fish Casino Slots - FREE Slot Machine Games | https://play.google.com/store/apps/details?id=com.williamsinteractive.goldfish |
| 19 | Jackpot World - Free Vegas Casino Slots | https://play.google.com/store/apps/details?id=com.grandegames.slots.dafu.casino |
| 20 | Scatter Slots- Las Vegas Casino Game 777 Online | https://play.google.com/store/apps/details?id=com.murka.scatterslots |
| 21 | Game of Thrones Slots Casino - Slot Machine Games | https://play.google.com/store/apps/details?id=com.zynga.gotslots |
| 22 | myVEGAS Slots: Las Vegas Casino Games & Slots | https://play.google.com/store/apps/details?id=com.playstudios.myvegas |
| 23 | my KONAMI Slots - Casino Games & Fun Slot Machines | https://play.google.com/store/apps/details?id=com.playstudios.mykonami |
| 24 | Cash Tornado Slots - Vegas Casino Slots | https://play.google.com/store/apps/details?id=com.topultragame.slotlasvega |
| 25 | Club Vegas 2021: New Slots Games & Casino bonuses | https://play.google.com/store/apps/details?id=com.bagelcode.slots1 |
| 26 | Bingo Pop - Live Multiplayer Bingo Games for Free | https://play.google.com/store/apps/details?id=com.uken.BingoPop |
| 27 | MONOPOLY Slots Free Slot Machines & Casino Games | https://play.google.com/store/apps/details?id=com.scientificgames.monopolyslots |
| 28 | Slots (Golden HoYeah) - Casino Slots | https://play.google.com/store/apps/details?id=com.igs.fafafa |
| 29 | GSN Casino: New Slots and Casino Games | https://play.google.com/store/apps/details?id=com.gsn.android.casino |
| 30 | Vegas Live Slots: Free Casino Slot Machine Games | https://play.google.com/store/apps/details?id=com.purplekiwii.vegaslive |
| 31 | Willy Wonka Free Slots Casino | https://play.google.com/store/apps/details?id=com.zynga.wonka |
| 32 | 88 Fortunes Casino Games & Free Slot Machine Games | https://play.google.com/store/apps/details?id=com.ballytechnologies.f88 |
| 33 | Classic Slots - Free Casino Games & Slot Machines | https://play.google.com/store/apps/details?id=com.aaagame.aaacasino |

| 34 | Jackpot Slot Machines - Slots Era Vegas Casino | https://play.google.com/store/apps/details?id=com.murka.slots era |
|----|---|---|
| 35 | Bingo Journey - Lucky & Fun Casino Bingo Games | https://play.google.com/store/apps/details?id=com.bingo.scape .android.free |
| 36 | Vegas Friends - Casino Slots for Free | https://play.google.com/store/apps/details?id=com.funtriolimit ed.slots.casino.free |
| 37 | Cashmania Slots 2021- Free Vegas Casino Slot Game | https://play.google.com/store/apps/details?id=com.zealgames.c ashmania&hl=en_US&gl=US |
| 38 | Tycoon Casino Free Slots: Vegas Slot Machine Games | https://play.google.com/store/apps/details?id=com.tw.tycoon.c asino |
| 39 | Hot Shot Casino Free Slots Games: Real Vegas Slots | https://play.google.com/store/apps/details?id=com.williamsint eractive.hotshotcasino |
| 40 | Jackpot Crush - Free Vegas Slot Machines | https://play.google.com/store/apps/details?id=slots.dcg.casino. games.free.android |
| 41 | High 5 Casino: The Home of Fun & Free Vegas Slots | https://play.google.com/store/apps/details?id=com.h5g.high5c asino |
| 42 | Neverland Casino Slots - Free Slots Games | https://play.google.com/store/apps/details?id=com.wgames.en. neverlandcasino |
| 43 | Double Win Casino Slots - Free Video Slots Games | https://play.google.com/store/apps/details?id=com.huge.slots.c asino.vegas.android.avidly |
| 44 | Ignite Classic Slots | https://play.google.com/store/apps/details?id=com.ignite.ignite slots |
| 45 | Rock N' Cash Casino Slots - Free Vegas Slot Games | https://play.google.com/store/apps/details?id=net.flysher.rockn cash |
| 46 | Huge Win Slots – Free Slots Games | https://play.google.com/store/apps/details?id=com.citrusjoy.tro jan |
| 47 | Casino Slots DoubleDown Fort Knox Free Vegas Games | https://play.google.com/store/apps/details?id=com.doubledow ninteractive.ftknox |
| 48 | Baba Wild Slots - Slot machines Vegas Casino Games | https://play.google.com/store/apps/details?id=com.bws |
| 49 | Epic Jackpot Slots - Free Vegas Casino Games | https://play.google.com/store/apps/details?id=com.epic.slots.ca sino.vegas.android.avidly |
| 50 | VegasStar Casino - FREE Slots | https://play.google.com/store/apps/details?id=com.zentertain.v egasstarcasino |

46.     Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise: Apple and Facebook.

**B.      Google's Facilitation, Promotion, and Control Over the Illegal Slots**

47.     Google, for its part, routinely facilitates the success of social casinos by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize their success on the Google Play Store.

48.     The Illegal Slot companies and Google monitor the game activity and use the collected data to increase user spending. This access to data is critical for the developers: since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Google or otherwise sign up for loyalty programs.[11]

49.     Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like DoubleDown refer to their top spenders.[12]

50.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.

51.     Google allows Illegal Slot companies to target high-spending users and activate non-spending users. Google aids in the design and direction of targeted advertising, both on Google.com, its larger Display Network, and within other apps and platforms, all aimed at driving new customers to the Illegal Slots and retaining current gamblers.

52.     Likewise, because they act as the "bank" for the Illegal Slots, the Platforms are entirely aware that certain consumers spend *hundreds of thousands of dollars* on the Illegal Slots.

53.     Additionally, because the Illegal Slots are required to use Google's payment system to process all in-game purchases, Google collects a 30 percent service fee off of every

---

[11]     DoubleDown Interactive Co., Ltd., Form F-1/A at 16 (June 30, 2020), https://bit.ly/2QqLW6v.

[12]     *The Journey From a Single-App to a Multi-App Company | Joe Sigrist*, YOUTUBE (Feb. 6, 2018) at 21:08, https://youtu.be/PY8gh8M6T20?t=1263 (Joe Sigrist, DoubleDown General Manager: "We track our whales").

transaction. If Google ever discovers an illegal or fraudulent transaction in breach of its terms or policies, it can deny developers from redeeming the proceeds in its active balance.

54. Unfortunately, Google used its developer tools to take advantage of users with severe gambling problems. As a result, Google has unlawfully made billions of dollars on the backs of consumers.

**III. California's Public Policy Against Enforcing Gambling Contracts Means Plaintiffs Must Turn to Federal Law to Recover Their Damages.**

55. Under California's *in pari delicto* doctrine, California courts generally refuse to enforce gambling debts or help plaintiffs recover gambling losses, except where a statute confers a right to bring such claims.

56. California's *in pari delicto* doctrine does not bar this Court from issuing an injunction, under California law, enjoining Google's participation in the Social Casino Enterprise.

57. Moreover, federal law—specifically, RICO—confers upon Plaintiffs a right of action, enforceable by this Court, to recover their alleged damages from Google.

## FACTS SPECIFIC TO PLAINTIFF JENNIFER ANDREWS

58. Plaintiff Andrews has paid money to DoubleDown Casino, through Defendant Google, for nearly ten years. Plaintiff Andrews is addicted to DoubleDown Casino.

59. Plaintiff Andrews would often play DoubleDown Casino for several hours per day and spend hundreds of dollars per day.

60. Playing DoubleDown Casino has had a devastating impact on Plaintiff Andrew's life. In total, Plaintiff Andrews has lost at least **$50,000** playing DoubleDown Casino.

61. Playing the game and its related losses have also placed a significant strain on her personal relationships and caused her great financial hardship.

## FACTS SPECIFIC TO PLAINTIFF JOHN SARLEY

62. Plaintiff Sarley has paid money to DoubleDown Casino, through Defendant Google, for at least five years. Plaintiff Sarley is addicted to DoubleDown Casino.

63. Playing DoubleDown Casino through Google has had a negative impact on

Plaintiff Sarley's life. In total, he has lost at least **$50,000** in the app.

64.     Plaintiff Sarley has asked Google to block him from making purchases for DoubleDown Casino, but they have never complied with this request.

65.     Plaintiff Sarley's addiction has put significant strain on his personal relationships and his mental well-being, as well as a significant strain on his financial well-being, including his ability to pay his bills.

## CLASS ALLEGATIONS

66.     **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who have lost money to any Illegal Slots through the Google platform.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

67.     **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

68.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

A. Whether the Illegal Slots are illegal slot machines as defined by California Penal Code § 330b;

B. Whether Google, pursuant to California Penal Code § 330.1, is liable for having the Illegal Slots in its management, possession, or control;

C. Whether Google, pursuant to California Penal Code § 330b, is liable for profiting off of the Illegal Slots;

D. Whether Google should be enjoined from further participation in the Social Casino Enterprise;

E. Whether Google is a participant in the Social Casino Enterprise; and

F. Whether Google has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

69. **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

70. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money playing the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

71. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these

policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

72. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

73. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## COUNT I
### Cal. Business and Professions Code § 17200, *et seq.* (UCL)
### Unlawful Business Practices
### (Injunctive Relief Only)

74. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

75. Plaintiffs have suffered injury in fact and have lost money or property as a result of Google's allegedly unlawful conduct.

76. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330b(d) because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330b(a), Defendant Google, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on

shares, lends and gives away, transports, and exposes for sale or lease, the Illegal Slots. Google also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permits the operations, placement, maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Google, the Illegal Slots.

77. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330.1(a), Defendant Google, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Google also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed, maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Google or under Google's management and control, the Illegal Slots.

78. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

79. Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

80. Consequently, the UCL authorizes this Court to enjoin Google's ongoing violations of Sections 330b and 330.1 of the California Penal Code, as well as violations of the federal RICO law.

81. Plaintiffs, on behalf of themselves and the Class, seek an order from the Court, enjoining Google from further participation in the Social Casino Enterprise.

**COUNT II**
**18 U.S.C. § 1962(c) (RICO)**
**Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**

82. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

83.     At all relevant times, Google is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

84.     Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were injured in their business and/or property as a result of the Social Casino Enterprise's wrongful conduct described herein, including but not limited to Defendant Google, the Platforms, and the Illegal Slots (1) having unlawfully taken and received money from Plaintiffs and the Class; (2) having never provided Plaintiffs and members of the Class a fair and objective chance to win—they could only lose; and (3) having directly and knowingly profited from, on information and belief, rigged and manipulated slot machines.

85.     Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

86.     18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, (i) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (ii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

87.     Because illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code, the Social Enterprise is engaged in "racketeering activity."

88.     18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

89.     Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

90.     Google violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under California Penal Code §§ 330b and 330.1.

91.     The affiliation between the Defendant Google, the other Platforms, and the Illegal Slot companies constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

### Social Casino Enterprise

92.      RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

93.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

94.     The Social Casino Enterprise is an association-in-fact composed of Google, Apple, Facebook, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

95.     The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

96.     For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in its online gambling scheme throughout the country. At the very latest, following the Ninth Circuit's March 28, 2018 holding in *Kater*, Defendant Google and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

Structure of the Social Casino Enterprise

97.     The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Google, Apple and Facebook). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A.     The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Google, Apple and Facebook for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B.     Google, Apple and Facebook agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Google, Apple, and Facebook agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

98. At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

99. The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

100. All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

101. Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

102. The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Class into the future.

<u>Pattern of Racketeering Activity</u>

103. The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

    A. Developing illegal slot machine games and disguising them as innocuous video game entertainment;

    B. Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

    C. Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    D. Providing a host platform to house unlicensed gambling activity;

    E. Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

F. Conspiring to uphold the Social Casino Enterprise; and

G. Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

104. The Social Casino Enterprise has operated as a continuous unit since at least 2010.

105. Pursuant to and in furtherance of their fraudulent scheme, Google committed multiple predicate act violations of California law as previously alleged herein, including violations of California Penal Code §§ 330b and 330.1.

**COUNT III**
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**

106. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

107. 18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

108. As described throughout, and in detail in Count II, even if it did not direct or manage the affairs of the Social Casino Enterprise, Google conspired to commit predicate acts in violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

109. Defendant Google acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Google agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

110. At the very latest, Google had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Google's post-*Kater* participation in the Social Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

111.   As a result of Google's conduct, Plaintiffs and Members of the Class were deprived of money and property that they would not otherwise have lost.

112.   Under 18 U.S.C. § 1964(c), the Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

### PRAYER FOR RELIEF

Plaintiffs Jennifer Andrews and John Sarley, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)   Certifying this case as a class action on behalf of the Class defined above, appointing Jennifer Andrews and John Sarley as representatives of the Class, and appointing their counsel as Class Counsel;

b)   Declaring that Defendant's conduct, as set out above, is unlawful under the UCL;

c)   Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

d)   Entering judgment against Defendant Google, in the amount of the losses suffered by Plaintiffs and each member of the Class;

e)   Enjoining Defendant from continuing the challenged conduct;

f)   Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

g)   Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial,

h)   Requiring disgorgement of all of Defendant Google's ill-gotten gains;

i)   Awarding reasonable attorney's fees and expenses;

j)   Awarding pre- and post-judgment interest, to the extent allowable;

k)   Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

l)   Awarding such other and further relief as equity and justice require, including all forms of relief provided for under the UCL and RICO.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**JENNIFER ANDREWS and JOHN SARLEY**,
individually and on behalf of all others similarly
situated,

Dated: March 25, 2021                By: /s/ Todd Logan
                                    *One of Plaintiffs' Attorneys*


Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silver-Korn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300 / Fax: 415.373.9435

*Counsel for Plaintiffs and the Proposed Class*

# EXHIBIT 1

1

The Honorable Ronald B. Leighton

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

8

9

ADRIENNE BENSON and MARY
SIMONSON, individually and on behalf of all
others similarly situated,

No. 2:18-cv-00525-RBL

10

11

*Plaintiffs,*

12

*v.*

13

14

DOUBLE DOWN INTERACTIVE, LLC, a
Washington limited liability company, and
INTERNATIONAL GAME TECHNOLOGY,
a Nevada corporation,

15

16

*Defendants.*

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF WILLA MOORE

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

DocuSign Envelope ID: BA189A5E-3E09-42B9-812B-7D460D34D956

## DECLARATION OF WILLA MOORE

I, Willa Moore, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I first downloaded DoubleDown Casino in 2013, after I was hospitalized for chronic pain issues. Because my mobility had decreased, I went on the internet more and more often, and when I was on Facebook, I found DoubleDown. I was drawn to DoubleDown because I could play the same games that I played when I went to real casinos.

2.     I started out playing probably 2-3 times a week, maybe for 4-6 hours each day. But very quickly, I was playing every day, sometimes more than 12 hours a day.

3.     Overall, I estimate that I have spent over $40,000 on chips in DoubleDown Casino.

4.     I am addicted to DoubleDown Casino. I never thought something like this could happen. I knew being on DoubleDown Casino every day for hours was a problem, but I couldn't seem to stop.

5.     I believe that DoubleDown is taking advantage of people's addictions. They know that gambling is addictive, and they act exactly like a physical casino that pays out money. But of course that's not the case. You buy more chips and you can't win money even though you're using real money to buy those chips. They are profiting off people's addiction to the game.

6.     I feel alone and embarrassed about spending money to do something that only feeds my addiction. DoubleDown Casino consumes you, and makes you feel like you always have to go play. I feel guilty because I've spent money on DoubleDown that I've needed to pay bills or buy food.

I declare under penalty of perjury that the above and foregoing is true and correct.

Executed on May 20 at (Hemet), (CA).

_Willa Moore_
WILLA MOORE

DECLARATION OF WILLA MOORE

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

ADRIENNE BENSON and MARY
SIMONSON, individually and on behalf of all
others similarly situated,

         *Plaintiffs,*

*v.*


DOUBLE DOWN INTERACTIVE, LLC, a
Washington limited liability company, and
INTERNATIONAL GAME TECHNOLOGY,
a Nevada corporation,
         *Defendants*.

No. 2:18-cv-00525-RBL

DECLARATION OF JAN SAARI

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

DocuSign Envelope ID: 253FE80D-C908-4190-A73C-17EB9A5AB3295

**DECLARATION OF JAN SAARI**

I, Jan Saari, pursuant to 28 U.S.C. § 1746, declare as follows:

      1.      I first started playing DoubleDown Casino around 2017 when I saw an ad on Facebook. Most Facebook ads I can ignore, but the DoubleDown Casino ad came up and said it was "free play" at their casino just by signing up. The graphics were colorful, they had a big selection of slot machines to choose from, and they offered a large amount of free chips to start playing with.

      2.      At the beginning, I would stop playing once my free chips ran out. But then I started purchasing, and everything changed. I would play every day, 7 days a week, for approximately 2-3 hours in the afternoon.

      3.      Overall, I believe I have spent close to $25,000 on DoubleDown Casino. I would buy the chips with a credit card which I couldn't pay in-full, so there's interest on top of that too.

      4.      DoubleDown Casino quickly went from my "best friend" to my worst nightmare. My partner was suffering serious health problems so I would turn to DoubleDown Casino to forget about all the problems he was having. I had a 2-3 hour window where I could tune out and have my time to play and feel the adrenaline rush of winning. As the free chips began running out (because I kept losing), I put a credit card on file to buy some more so I could keep playing. You could buy different packages that they would offer from $9.99 to $249.00. The more you spent, the more chips you would receive. After buying the smaller packages, I found that I would lose them in a short time, while if I bought a more expensive package, I would receive more jackpots and get to play longer.

      5.      This type of online casino has a lot of pitfalls. When you go to their site each day, they let you know that certain games have a better chance of hitting the jackpots. They also say that the higher the bet you place, the better your chance of hitting a big jackpot. This tells me that they can manipulate the games to pay more or less, and they have the power to do that. If they see you as a repeat buying customer, they may make your games pay less so you buy more chips to keep playing. At least, that is how it seems to me. You also are given ranks so that when you

DECLARATION OF JAN SAARI

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

reach a new level (by purchasing more chips) you are given more free chips. They also give you an ambassador or V.I.P. rep to contact if you have any concerns with purchasing chips or other matters. It makes you feel like you have a friend on the other end.

6.     I was a well-respected, active member of my community who owned my own business for 36 years. But when I retired, and my fellow started having health problems, DoubleDown Casino made me fall into the trap of escape and adrenaline rush to cope with all my other responsibilities. When I won, it was just great. When I lost, and started buying more and more chips, I felt lower than pond scum. I was sick to my stomach, felt like a total loser, wondered about suicide (although I would never leave my partner), could not sleep, had anxiety attacks with a rushing heart, and couldn't eat. I just couldn't understand how I could let it get so out of control. It was as if it had a power over me that I couldn't break. I couldn't stop.

I declare under penalty of perjury that the above and foregoing is true and correct.

Executed on this 12    day of March at Vancouver    , Washington    .

Jan Saari
JAN SAARI

DECLARATION OF JAN SAARI

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

# EXHIBIT 3

The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

SHERYL FIFE, individually and on
behalf of all others similarly situated,

          *Plaintiff*,

v.

SCIENTIFIC GAMES CORP., a Nevada
corporation,

          *Defendant*.

No. 2:18-cv-00565-RBL

DECLARATION OF LAURA PERKINSON

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

**DECLARATION OF LAURA PERKINSON**

I, Laura Perkinson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I downloaded Jackpot Party Casino because of my disability. I was disabled in an accident in the early 90s. It is very depressing to not be able to do what you have always done in the past and not be able to run or walk well at all. I turned to friends on the computer and they led me to games of a different kind. Soon, I started to get emails and letters from online casinos. At first, I did not follow up, but they kept giving me more and more great offers. I started playing many games including Jackpot Party Casino. Before I knew it, I found myself playing and paying way more than I should have.

2.      At first, I played for only maybe an hour at a time or when I had any down time at all. When I lost my husband, I spent a lot more time playing these games, sometimes 4 to 5 hours a day.

3.      Overall, I believe that I have spent between $10,000-$20,000 playing Jackpot Party Casino.

4.      I was addicted to Jackpot Party Casino and I hate that. Having very little to do every day and getting such amazing offers makes you think you might actually win something. Yet, you don't. I didn't even realize they fix the games. If you ever get to a high amount such as a billion, you will lose until you have to buy. If you don't buy you won't have enough coins to play longer than 10 minutes. At that point, they start bombarding you with offers that sound great. Even then if you buy in, you may have to do so 3 or 4 times before they make it so you can win. I was stupid enough to keep on playing. This kind of loss put a huge strain on my ability to even buy food since I had spent money on a stupid game.

5.      I believe Jackpot Party Casino had been taking advantage of my addiction. Each day you get a small amount of free coins just to get you going and sucked in for the day. Those coins don't last long so you end up buying more in order to keep playing. Once you get down to a lower amount of coins they will instantly start flashing deals onto your screen. Instead of paying $49.99, you can get the same amount of coins for just $29.99. A lot of these are deals that

DECLARATION OF LAURA PERKINSON

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  you can't resist at all. When I would get an email with some kind of offer, I would go play it,

2  each and every time. Just as I was going to lose all the coins they gave me, I would almost win a

3  big amount, which was enough to get me to pay more money.

4       6.      This game hurt me and the worst part was that when my husband was alive, he

5  would say, "You're not spending money on there are you?" and I lied. I hate that I have to live

6  with that now.

   I declare under penalty of perjury that the above and foregoing is true and correct.

10  Executed on this 12___ day of March at __Centralia__, __Washington__.

13                                    _Laura Perkinson_____

14                                    LAURA PERKINSON

DECLARATION OF LAURA PERKINSON

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

# EXHIBIT 4

The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

SHERYL FIFE, individually and on behalf of all others similarly situated,

No. 2:18-cv-00565-RBL

*Plaintiff*,

v.

SCIENTIFIC GAMES CORP., a Nevada corporation,

*Defendant*.

DECLARATION OF DONNA REED

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

DocuSign Envelope ID: E28E341B-3586-45BC-993D-3583F7A1556A

**DECLARATION OF DONNA REED**

I, Donna Reed, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I first started playing Jackpot Party Casino in 2013 after a friend sent it to me. It was addictive right away.

2.      I would play Jackpot Party Casino 7 days a week for probably 5 to 6 hours a day.

3.      I believe that I've spent at least $30,000 on Jackpot Party Casino over the 6 years that I played. I didn't spend that much at first. But once I retired and started going through marital problems, it became my vice. I didn't realize how much I was spending.

4.      I am married to a very controlling man and he spends money like water on things he wants such as classic cars and photography equipment. I would just stay home and take care of our 4 dogs. It got to where Jackpot Party Casino was the only outlet I had in my life. And it got out of control.

5.      I saw my husband spending all this money so I thought to myself, "look I can do the same." It's so easy to spend money from home so you keep purchasing because you don't realize how much you're spending at the time. I work at a casino now and I don't gamble at all there; Jackpot Party makes it so easy to gamble from your own home.

6.      I am going through a divorce right now, in part because of how much money I spent on Jackpot Party. This has made it very difficult to stop playing and spending. But I have cut down my spending because I just don't have the money anymore.

7.      I believe Scientific Games has acted unfairly and taken advantage of my addiction. I began to lose more frequently when I was spending a lot and that meant that I had to keep purchasing coins. Scientific Games will provide incentives to their top spenders so that they continue to spend. I have received Christmas gifts two times. They have sent me a robe, oils, phone charger, bath bombs, a blanket, and more. I know that they have sent other players flowers and candies.

8.      This game has changed my way of thinking and caring. I never thought I would get addicted to anything except cigarettes, but this has taken too much of my life away. I don't

DECLARATION OF DONNA REED

DocuSign Envelope ID: E28E3A4B-2580-45EC-99BD-5E687E91556AD

1  know how my life would be different without this game, but I know that it would be better and I

2  know that I would be much better off financially. I am going to try to get some help and I think

3  these games of gambling should be banned from the internet. I wouldn't miss it if they got rid of

4  it. I wish it didn't exist.

5

6

7       I declare under penalty of perjury that the above and foregoing is true and correct.

8

9

10

11       Executed on this ___6th___ day of March at ___Silverdale___, ___Washington___.

12

13

14                                                      *Donna Reed*
                                            DONNA REED

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF DONNA REED

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

# EXHIBIT 5

THE HONORABLE RONALD B. LEIGHTON

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| SEAN WILSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>PTT, LLC, a Delaware limited liability company, d/b/a HIGH 5 GAMES, LLC, a Delaware limited liability company,<br><br>*Defendant*. | Case No. 18-cv-05275-RBL |

DocuSign Envelope ID: 0AC7EBCC-7B27-4AD4-B2A9-EB0003DABE5DA

**DECLARATION OF AIDA GLOVER**

I, Aida Glover, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I first started playing High 5 Casino approximately 5 or 6 years ago when I retired.

2.   I play High 5 Casino every day, multiple times a day.

3.   Overall, I believe I have spent at least $10,000 on coins in High 5 Casino.

4.   I believe I am addicted to High 5 Casino. I do not have kids and there really isn't a whole lot to do. This passes the time, but I have really gotten sucked into it. I have tried to quit but I believe three weeks is the longest amount of time I've ever been able to stop.

5.   High 5 Casino really draws you into their game. It is very addicting because you get bonus coins, and they also put out a new game every Thursday. That keeps it exciting and gives me something new to look forward to. I believe it's a way for High 5 to keep people playing and spending.

6.   I believe that High 5 Casino is unfair. My belief is that that they manipulate the machine by looking at the level you are on and how much you have spent. There are so many pop-up messages to try to get you to buy more coins and I think they intentionally do this when your coins are getting lower so you are much more likely to purchase.

7.   Sometimes I feel guilty about playing High 5 Casino and spending so much money. My husband does not know I have spent money on it. My grandkids will sometimes ask for money and I can't give it to them because I have to save it for this game.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May _20__ 2020 at __Yacolt_____, __Washington_____.

_A ida Glover_____

AIDA GLOVER

---

DECLARATION OF AIDA GLOVER            1            CASE NO. 18-cv-05275-RBL

# EXHIBIT 6
## (Samsung Galaxy Tablet Lodged with Court)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JENNIFER ANDREWS and JOHN SARLEY, individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff   Benton County, MN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Edelson PC
123 Townsend Street, San Francisco, CA 94107 Tel: 415.212.9300

## DEFENDANTS

GOOGLE LLC, a Delaware limited liability company

County of Residence of First Listed Defendant   Santa Clara County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | ☒ 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | | | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations | 530 General | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 448 Education | 540 Mandamus & Other | | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332; 18 U.S.C. § 1962

Brief description of cause:
Cal. Business and Professions Code § 17200, 18 U.S.C. § 1962 (RICO)

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.    DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE     DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*    ☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

DATE   03/25/2021     SIGNATURE OF ATTORNEY OF RECORD    /s/ Todd Logan

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II. **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX. **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:21-cv-02100-WHO

Andrews et al v. Google LLC
Assigned to: Judge William H. Orrick
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 03/25/2021
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt
Organization
Jurisdiction: Diversity

**Plaintiff**

**Jennifer Andrews**
*individually and on behalf of all others*
*similarly situated*

represented by **Todd M. Logan**
Edelson PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
(415) 212-9300
Fax: (415) 373-9435
Email: tlogan@edelson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brandt Silver-Korn**
Edelson PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
(415) 212-9300
Fax: (415) 373-9435
Email: bsilverkorn@edelson.com
*ATTORNEY TO BE NOTICED*

**Rafey Sarkis Balabanian**
Edelson PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
(415) 212-9300
Fax: (415) 373-9435
Email: rbalabanian@edelson.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Sarley**
*individually and on behalf of all others*
*similarly situated*

represented by **Todd M. Logan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brandt Silver-Korn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rafey Sarkis Balabanian**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**
*a Delaware limited liability company*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2021 | 1 | CLASS ACTION COMPLAINT Jury Demand against Google LLC (Filing fee $402, receipt number 0971-15751743). Filed by Jennifer Andrews, John Sarley. (Attachments: # 1 Exhibit 1 - Declaration of Willa Moore, # 2 Exhibit 2 - Declaration of Jan Saari, # 3 Exhibit 3 - Declaration of Laura Perkinson, # 4 Exhibit 4 - Declaration of Donna Reed, # 5 Exhibit 5 - Declaration of Aida Glover, # 6 Exhibit 6 - (Samsung Galaxy Tablet Lodged with Court), # 7 Civil Cover Sheet)(Logan, Todd) (Filed on 3/25/2021) Modified on 3/29/2021 (jlgS, COURT STAFF). (Entered: 03/25/2021) |
| 03/25/2021 | | Electronic filing error. Please resubmit Civil Cover Sheet. Use October 2020 version which can be downloaded from https://www.cand.uscourts.gov/. No judge assignment will be made until the document is e-filed. Submit your document using Civil Events > Other Filings > Other Documents > Civil Cover Sheet Re: 1 Complaint,, filed by Jennifer Andrews, John Sarley (mbcS, COURT STAFF) (Filed on 3/25/2021) (Entered: 03/25/2021) |
| 03/25/2021 | 2 | Civil Cover Sheet by Jennifer Andrews, John Sarley . (Logan, Todd) (Filed on 3/25/2021) (Entered: 03/25/2021) |
| 03/25/2021 | 3 | Case assigned to Magistrate Judge Susan van Keulen. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 4/8/2021. (mbcS, COURT STAFF) (Filed on 3/25/2021) (Entered: 03/25/2021) |
| 03/26/2021 | 4 | Proposed Summons. (Logan, Todd) (Filed on 3/26/2021) (Entered: 03/26/2021) |
| 03/26/2021 | 5 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Jennifer Andrews, John Sarley.. (Logan, Todd) (Filed on 3/26/2021) (Entered: 03/26/2021) |
| 03/26/2021 | 6 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. |

| | | ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. |
| | | *This is a text only docket entry; there is no document associated with this notice.* (jhfS, COURT STAFF) (Filed on 3/26/2021) (Entered: 03/26/2021) |
| 03/26/2021 | 7 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 6/22/2021. Initial Case Management Conference set for 6/29/2021 09:30 AM in San Jose, Courtroom 6, 4th Floor. (cv, COURT STAFF) (Filed on 3/26/2021) (Entered: 03/26/2021)** |
| 03/26/2021 | 8 | Summons Issued as to Google LLC. (cv, COURT STAFF) (Filed on 3/26/2021) (Entered: 03/26/2021) |
| 03/29/2021 | 9 | This case will be randomly reassigned to a District Judge outside the San Jose Division pursuant to the Caseload Rebalancing Pilot Program approved by the Court effective March 1, 2018. For information, visit our web page at http://cand.uscourts.gov/news/225. (bwS, COURT STAFF) (Filed on 3/29/2021) (Entered: 03/29/2021) |
| 03/29/2021 | 10 | Case REASSIGNED to Judge William H. Orrick. Judge. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Magistrate Judge Susan Van Keulen no longer assigned to case. (Attachments: # 1 Notice of Eligibility for Video Recording) (bwS, COURT STAFF) (Filed on 3/29/2021) (Entered: 03/29/2021) |
| 03/29/2021 | 11 | **CASE MANAGEMENT SCHEDULING ORDER: Case Management Conference set for 6/29/2021 02:00 PM in San Francisco, Courtroom 02, 17th Floor. Signed by Judge William H. Orrick on 03/29/2021. (jmdS, COURT STAFF) (Filed on 3/29/2021) (Entered: 03/29/2021)** |
| 04/05/2021 | 12 | CERTIFICATE OF SERVICE by Jennifer Andrews, John Sarley (Logan, Todd) (Filed on 4/5/2021) (Entered: 04/05/2021) |
| 04/05/2021 | 13 | Certificate of Interested Entities by Jennifer Andrews, John Sarley (Logan, Todd) (Filed on 4/5/2021) (Entered: 04/05/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/09/2021 12:58:32 | | | |
| **PACER Login:** | piratepoet:5059583:5083602 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-02100-WHO |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |